United States District Court
Southern District of Texas
**ENTERED**
January 08, 2025
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| **WAPITI ENERGY, LLC,** § | |
| § | |
| Plaintiff, § | |
| § | |
| VS. § | CIVIL ACTION NO. 4:22-CV-01192 |
| § | |
| **CLEAR SPRING PROPERTY AND** § | |
| **CASUALTY COMPANY,** § | |
| § | |
| Defendant. § | |

## MEMORANDUM AND ORDER

Currently before this Court are Plaintiff's two motions for summary judgment. Docs. 37, 38. Plaintiff's first motion seeks damages for cost of removal of a barge whereas Plaintiff's second motion seeks to establish liability for breach of the duty of good faith and fair dealing. *Id.* For the reasons discussed below, Plaintiff's motion for summary judgment on the issue of damages is **GRANTED** in part and **DENIED** in part. Plaintiff's motion for summary judgment on the issue of good faith and fair dealing is **DENIED**.

**I. BACKGROUND**

    **A. Factual Background**

The parties do not dispute the basic facts of this case. Plaintiff Wapiti Energy, LLC is a Texas oil and gas exploration and production company. Doc. 13 at 1-2. It owns oil storage barges in waterways in Louisiana. *Id.* at 2. In July 2021, Defendant Clear Spring Property and Casualty Company issued Plaintiff a twelve-month insurance package policy meant to cover four vessels: one tugboat and three tank barges. The package included two different policies: a hull coverage

policy ("hull policy") and a protection and indemnity policy ("P&I policy").[1] Hull policies typically provide coverage to the insured for damage that "occurs to the vessel" due to specified causes. *Blair v. Suard Barge Servs.*, No. 03-909, 2004 U.S. Dist. LEXIS 2461 (E.D. La. Feb. 18, 2004). Conversely, P&I policies are issued to protect owners of a vessel from risks not encompassed by a hull policy—unlike a hull policy, a P&I policy provides insurance for "tortious liability the owner of the vessel incurs as a consequence of his ownership of the vessel." *Id*. at *23. Put differently, while hull policies provide compensation for damage done to the barge, P&I policies compensate the insurer for the harm that the barge has done to others.

In the instant case, the hull policy covered losses resulting from enumerated perils for four of Wapiti's vessels. Doc. 15-3 at 3, 6. It covered agreed hull values of $350,000 for three of the covered barges, including the SMI 315, the vessel at issue here. Doc. 13 at 2. The P&I policy provided indemnity for enumerated liability claims, including wreck removal. Doc. 15-3 at 11-13. The P&I limit for each barge was $1,000,000, subject to a $10,000 deductible. Doc. 13 at 3.

In August 2021, Hurricane Ida made landfall in Louisiana. As a result of the hurricane, Plaintiff's crude oil barge SMI 315 slipped its moorings and was set adrift, eventually washing aground on marshland owned by ConocoPhillips. Doc. 13 at 3. An evaluation indicated that the barge's hull remained intact, no oil had leaked, and there no immediate threat of leakage from the grounded barge. *Id.* at 3. Operating under an understanding that it was legally obligated to remove its wreck from private property, Plaintiff began obtaining bids for its removal and ultimately received a salvage bid estimate of $880,000. *Id.* Plaintiff submitted a claim for these costs to

---

[1] The actual text of the marine insurance package policy issued by Defendant does not refer to the Hull and P&I components as separate "policies." Rather, it only refers to them as "sections" of the overall insurance package. Doc. 1-2 at 1. However, both Plaintiff and Defendant have referred to these sections as the "P&I Policy" and "Hull Policy" throughout this litigation. See Doc. 1; Doc. 3. To maintain consistency, the Court will do the same.

Defendant under its P&I policy, which covers compulsory wreck removal: "Liability for cost or expenses of, or incidental to, the removal of the wreck of the vessel named herein when such removal is compulsory by law." Doc. 16-1 at 13. However, Defendant denied the claim and offered a payment of only $265,000 under the hull policy for the remaining value of the barge. It informed Plaintiff that it considered the vessel a constructive loss due to the significant disparity between the salvage costs and the value of the hull. Docs. 13 at 4; 15-3 at 6-8.

Plaintiff safely removed the oil that the barge was carrying and refloated and towed the barge without incident. Doc. 13 at 4. The total amount expended in the recovery and removal of the barge was $926,840.32. *Id.* at 5. The parties have resolved Wapiti's portion of the claim under the hull policy. However, the claim on the P&I policy remains in dispute and is the subject of this pending action.

### B. Procedural History

Plaintiff filed the present case in April 2022 under federal admiralty and maritime jurisdiction pursuant to 28 U.S.C. § 1333 and, alternatively, under diversity jurisdiction pursuant to 28 U.S.C. § 1332. Doc. 13. In December 2022, this Court ruled that the removal of the barge was not "compulsory by law" as that language appears in marine protection and indemnity policies. *Wapiti Energy, LLC v. Clear Spring Prop. & Cas. Co.*, No. 4:22-CV-01192, 2023 U.S. Dist. LEXIS 32717 (S.D. Tex. Feb. 28, 2023). The Court dismissed Plaintiff's claims, and Plaintiff timely appealed. *Id.*

The Fifth Circuit has acknowledged that removal of a wreck is compulsory in the following circumstances: (1) when criminal sanctions would be imposed for failure to remove; (2) when a government order mandates removal; or when (3) a cost-benefit analysis conducted by a fully informed, reasonable owner at the time of the incident demonstrates that the amount and likelihood

of liability imposed by a failure to remove mandates removal of the wreck. *Energy, L.L.C. v. Clear Spring Prop. & Cas. Co.*, 106 F.4th 420, 425 (5th Cir. 2024). In July 2024, the Fifth Circuit recognized that state law can be the source of potential liability sufficient to compel the removal of a wreck. *Id*. Reversing this Court's decision, the Court found that "the Louisiana possessory action made removal of the SMI 315 compulsory by law" and remanded the case to this Court. *Id*. Shortly after, Plaintiff filed a motion for summary judgment on damages (Doc. 37) and a motion for summary judgment on breach of the duty of good faith and fair dealing (Doc. 38).

## I. STANDARD OF REVIEW

Summary judgment under Rule 56 "is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting FED. R. CIV. P. 56(c)). A genuine issue as to a material fact arises "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court must draw all "reasonable inferences . . . in favor of the nonmoving party, but the nonmoving party 'cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence.'" *Hathaway v. Bazany*, 507 F.3d 312, 319 (5th Cir. 2007) (quoting *Turner v. Baylor Richardson Medical Center*, 476 F.3d 337, 343 (5th Cir. 2007)). "[T]he movant bears the initial responsibility of demonstrating the absence of a genuine issue of material fact with respect to those issues on which the movant bears the burden of proof at trial." *Transamerica Ins. Co. v. Avenell*, 66 F.3d 715, 718 (5th Cir. 1995). "For any matter on which the non-movant would bear the burden of proof at trial, however, the movant may merely point to the absence of evidence and thereby shift to the non-movant the burden of demonstrating

by competent summary judgment proof that there is an issue of material fact warranting trial." *Id.* at 718–19.

## II. ANALYSIS

### A. Damages

Plaintiff argues Defendant was required to cover the costs of the barge's removal based on the wreck removal clause in the P&I policy. Doc. 37 at 5. Plaintiff contends that, because the P&I policy applies, it is entitled to its costs and expenses for removal of the wreck which amount to $926,840.32 in addition to pre- and post-judgment interest and attorneys' fees. The Court will address each contention in turn.

#### i. Does the P&I policy apply?

The P&I policy covers "[l]iability for costs or expense of, or incidental to, the removal of the wreck of the vessel . . . when such a removal is compulsory by law." Doc. 37-1 at 15. The Fifth Circuit has already resolved that the removal of the barge was compulsory by law—however, the parties continue to debate whether the barge's condition qualified it as a "wreck." *See generally* Doc. 41, Doc. 42. The policy does not define "wreck," so the Court must look beyond the four corners of the document to determine whether the barge's condition at removal triggers the P&I policy.

Caselaw has defined "wreck" as "a sunken vessel damaged so extremely that it is unnavigable," "damaged to the extent of being rendered unnavigable," or a vessel that "is so injured by encountering ordinary perils of navigation as to be unfit to complete the particular voyage commenced." *M.J. Rudolph Corp. v. Lumber Mutual Fire Insurance Co.*, 371 F.Supp. 1325, 1327 (E.D.N.Y.1974). *See Zurich Ins. Co. v. Pateman*, 692 F.Supp. 371, 379 (D.N.J. 1987) ("The vessel was un-navigable and therefore meets the legal definition of a 'wreck.' Thus, the

wreck removal [provision] of the P&I coverage is applicable to this case."); *Henderson v. Arundel Corp.*, 262 F. Supp 152, 155 (D. Md. 1966); *State Nat. Ins. Co. v. Anzhela Explorer, LLC,* 812 F.Supp.2d 1326, 1349 (S.D. Fla. 2011) ("he recognized that the vessel was a constructive total loss. The nature of the salvage operation changed from salvage to wreck removal at that time."). In short, what seems to be most important variable in 'wreck' inquiries is whether the vessel is 'navigable.'

There is no unanimous definition of a "navigable vessel." However, courts are in general agreement that navigability refers to a vessel's capability to move and operate independently. *See JSM Marine LLC v. Gaughf*, 407 F. Supp. 3d 1358, 1372 (S.D. Ga. 2019) (a vessel that "has been driven ashore" and requires "pulling power to get her off" is unnavigable); *The Wis.*, 30 F. 846, 847 (E.D.N.Y. 1887) ( a vessel was "wholly unnavigable" when the vessel was "hard ashore" and could not move or navigate independent of outside assistance); *Fowles v. Am. Exp. Lines, Inc.,* 300 F. Supp. 1293, 1296 (S.D.N.Y. 1969) (a vessel need not be "absolutely unnavigable" to be considered a wreck, but rather, a vessel becomes "wrecked" when a ship is rendered "incapable of carrying out the maritime adventure" it was contracted to do for a reason that was not in "the control or fault of the owner"). *Accord Flanagan v. U.S. and Brazil Mail SS Co.,* 30 F. 202 (E.D.N.Y.1886); *The Staghound and The Gamecock,* 97 F. 973 (D.Or.1899); *The Quaker City,* 290 F. 409 (D.Md.1923); *Avgoustis v. Erini Shipping Co.,* 177 F.2d 461 (2d Cir. 1949; *Henderson v. Arundel Corp.,* 262 F. Supp. 152 (D.C.Md.1966) aff'd per curiam 384 F.2d 998 (4th Cir. 1967).

Defendant contends that, because the barge was "floated free of the marsh and towed back to defendant's facility without any need for maintenance or repair as a consequence of the grounding incident," the barge cannot be considered a "wreck." Doc. 41 at 12. The Court disagrees. A vessel does not need to require maintenance or repair to be considered "unnavigable" or a

"wreck"—and Defendant does not point to definitive case law indicating otherwise. Conversely, parties agree that the barge needed pulling power to remove it from the location it was run aground on, and that the barge was clearly unable to unmoor itself and independently navigate through the water. Under these conditions, the Court finds that the barge met the conditions necessary for it be considered both unnavigable and a "wreck" as the meaning is understood in maritime law.

Because there is no dispute of fact or law as to whether the barge was (1) a "wreck at the time of removal or (2) that the removal of the barge's removal was compulsory by law, the Court finds that the P&I policy squarely applies and **GRANTS** summary judgment on that issue.

        ii.      How much is owed under the P&I policy?

After concluding that the P&I policy applies, the Court turns to whether summary judgment should be granted on damages "for the costs and expenses incurred" in the removal of the barge. As noted, Plaintiff seeks $926,840.32, which includes fees incurred for surveying, recovery, towing, and the transfer of oil from the vessel. As Defendant concedes, Plaintiff has provided evidence of payment for the expenses it seeks. Doc. 41 at 4. *See* Doc. 41, Exhibits 1-8. However, Defendant contends that the amount sought may need to be reduced because of (1) Plaintiff's potential non-compliance with the P&I policy's warranted hurricane plan, and because of (2) Plaintiff's overinsurance of the barge, which "may have affected [Defendant's] underwriting decisions in connection with Wapiti's application for insurance." Doc. 41 at 6-7.

The Court is troubled that Defendant has not raised the hurricane plan defense nor the overinsurance defense in the nearly three years that have passed since the claim was made. Plaintiff contends that Defendant violated §541.060(a)(3) of the Texas Insurance Code by failing to "promptly provide to [Wapiti] a reasonable explanation. . . for the insurer's denial of [the] claim" as well as §541.060(a)(4)(B) for failing to submit a reservation of rights within a reasonable time.

Tex. Ins. Code. Ann. §541.060(a)(3); Tex. Ins. Code. Ann. §541.060(a)(4)(B). It argues that this breach of the insurance code means that Defendant "should be prohibited from bringing up new bases for denial that were not timely communicated to Wapiti at the outset of the claim." Doc. 42 at 7. Yet, as the Court describes below, it is unsettled whether Defendant violated those sections of the Texas Insurance Code to begin with. *See* Part B, *infra*. Even if Defendant has conclusively violated §541.060 of the Texas Insurance Code, it is not clear that such violations would result in a waiver of its hurricane plan defense or its overinsurance defense at this stage—nor does Plaintiff point to any law that suggests otherwise.[2] As such, the Court cannot find that Defendant is "precluded by the Texas Insurance Code" from raising these bases for denial of coverage at this stage. The Court will address the merits of each defense in turn.

Section 4 of the marine insurance package lists several warranties requiring the provision of certain forms and certifications. The section provides that a "[f]ailure to complete [the enumerated warranties] may impact coverage in the event of an incident." Doc. 1-1 at 2. One of these enumerated warranties requires that a "Warranted Hurricane Plan" be "completed and signed by the insured." *Id*. The marine insurance package does not define what a warranted hurricane plan is exactly. Nonetheless, courts have observed that the term (and terms like it) refer to a detailed plan that an insured must follow to properly secure its vessel when a hurricane is approaching. *See Great Lakes Ins., S.E. v. Gray Grp. Invs., L.L.C.,* 76 F.4th 341, 350 (5th Cir. 2023) (acknowledging that a properly warranted hurricane plan requires the insured to both "provide . . . a hurricane protection plan as to the insured watercraft" and to ultimately comply with such a plan). Essentially, the insurance company "warrants" that the insured has taken reasonable steps to

---

[2] As Defendant correctly notes, this case was previously decided and appealed early in the litigation—before any significant discovery on damages had begun. Doc. 41 at 3. It is not unreasonable for Defendant to have raised discovery inquiries regarding damages at this stage.

mitigate potential damage from a hurricane, and if the insured fails to do so, its claim may be denied or reduced. Thus, what was required of Plaintiff by the terms of the marine insurance package was to, provide first, a written and signed hurricane plan that detailed the steps that Plaintiff would take in the event of the hurricane; and second, to follow those steps ahead of Hurricane Ida.

It is unclear if Plaintiff provided Defendant a written and signed copy of its hurricane plan. In discovery, Plaintiff confirmed that, as of August 27th, 2021, "both SMI 315 and SMI 50 were in their pilings and secured with extra ropes"—thereby indicating that such steps were the "hurricane plan" referenced in the warranty. *Id*. at 6. Dissatisfied with this answer, Defendant submitted Supplemental Interrogatory Requests, one of which asked Plaintiff to "provide the name, employer, last known address, and telephone number of the individuals who secured the barge SMI-315 in accordance with the Hurricane Plan." *Id*. Plaintiff objected on various grounds, noting that the information asked of it was "irrelevant and not at issue with respect to the damage and coverage matters issues." *Id*. at 7. Plaintiff's answer then referred Defendant to its response to the previous interrogatory. *Id*. Accordingly, Defendant asks the Court to deny summary judgment to allow Defendant to conduct further discovery to "determine if [the hurricane plan] was complied with." *Id*. at 5.

Defendant's requested discovery seeks both to confirm that a hurricane plan existed prior to Hurricane Ida's landfall and to determine if such a hurricane plan was ultimately complied with. Doc. 41 at 6. The Court notes that there is no summary judgment evidence showing that a warranted hurricane plan was completed and signed, and finds that there is a material dispute of fact on whether (1) Plaintiff had provided Defendant a written and signed copy of a hurricane plan as requested in the marine insurance package, (2) if Plaintiff did actually comply with such a

hurricane plan ahead of Hurricane Ida, and (3) if there was any non-compliance, how much the damages award should be affected.

As to Defendant's argument regarding potential overinsurance, Defendant asks that summary judgment be denied pending further discovery. Specifically, Defendant wishes to determine why the barge prior to the hurricane was insured for more than its market value, and argues that discovery on this issue could potentially affect damages. Doc. 41 at 6.

Defendant relies on an unpublished opinion in which an insurance policy for a vessel was held to be void because Plaintiff had failed to disclose the purchase price of the vessel to the insurer. *Musashi AZ LLC v. Accelerant Specialty Ins. Co.*, No. 23-22781-CIV, 2024 U.S. Dist. LEXIS 96341 (S.D. Fla. May 30, 2024). The court held that, because the purchase price of the vessel was material to the insurer's hull value determinations and deductible, the policy that was built on the false purchase price was void. *Id*. However, in *Musashi*, the material misrepresentation regarding the purchase price of the vessel was significant because the plaintiff was seeking to use the insurance policy to cover the physical loss or damage to the vessel and its equipment. *Id.* at *3 (". . . the Vessel caught fire while at a Marina. As a result, the Vessel was a constructive total loss. Plaintiff sought coverage for the loss under an Insurance Policy . . . for an agreed hull value of $1,850,000"). At dispute was not the P&I policy—which protects vessel owners against liability for damage caused to third parties—but rather, the hull policy, which covers physical damage to a vessel itself. The significance of this distinction is that the value of a hull policy is often extremely dependent on the actual value of the vessel itself—particularly because the policy seeks to compensate an insured for the value lost due to the injury to the vessel. *See Collins v. A.B.C. Marine Towing, L.L.C.*, No. 14-1900, 2015 U.S. Dist. LEXIS 134776 at *6 (E.D. La. Oct. 2, 2015) (referring to a hull policy in which the policy amount was directly related to the "fair market value

of the Vessel"). P&I policies are generally much less dependent on a vessel's actual value. Instead, P&I policies are typically much more influenced by a shipowner's claims history and factors that determine a vessel's likelihood of causing damage to a third party. *Brown v. Yaring's of Tex., Inc.*, 643 F. Supp. 3d 1304, 1316 (S.D. Ala. 2022) (when determining a P&I policy's limits and deductible, underwriters "considered the risk profile for the insured").

In the instant case, Defendant contends that there was a potential material misrepresentation regarding the fair market value of the vessel. However, summary judgment evidence demonstrates that such a potential misrepresentation would have an effect only on the hull policy's underwriting decisions in this case, not the P&I policy. The Court need only look to Defendant's insurance policy to determine that the fair market value of a vessel did not have any effect on the underwriting decisions regarding the P&I limit or the P&I deductible. Doc. 1-1 at 3 (revealing that, across the four vessels that were insured under marine insurance package, all vessels—even one that had a fair market value of only $106,000—had identical P&I limits and deductibles to vessels valued at $350,000). Thus, it is clear that the instant P&I policy was not dependent on the market value of the vessels. *Garcia v. Am. United Life Ins. Co.*, 422 F. App'x 306, 312 (5th Cir. 2011) (a misrepresentation is material if the facts that were misrepresented or omitted would have affected the insurance company's decision to issue the policy). A potential misrepresentation of the market value of the vessel does not have bearing on whether Plaintiff may recover damages under the P&I policy because summary judgment evidence indicates that market value of the vessels did not control or influence the underwriter's decisions with respect to P&I limits and deductibles. *Hinna v. Blue Cross Blue Shield of Tex.*, No. 4:06-CV-810-A, 2007 U.S. Dist. LEXIS 78235 at *18 (N.D. Tex. Oct. 22, 2007) ("[m]ateriality to the risk is viewed as of the time of the issuance of the policy, not at the time the loss occurred").

While Defendant now contends—three years after the claim was filed—that such a misrepresentation could have influenced the underwriter's decision, it provides no evidence as to that contention. Nor does Defendant address the evidence demonstrating that a vessel with a market value of $106,000, insured under the same marine protection package as the SMI 315, had the same P&I policy terms apply to it as vessels with a market value of $350,000. The Court finds that discovery on the issue of overinsurance does not present a material dispute of fact on the amount in damages Plaintiff is entitled to under the P&I policy. However, because the Court finds there is a material dispute of fact on the warranted hurricane plan's existence, enforcement, and potential impact on the damages calculation, the Court declines to issue summary judgment on damages under the P&I policy.

                iii.    Attorneys' Fees, Pre- and Post-Judgment Interest

Because damages must be ascertained first, the Court denies summary judgment on attorneys' fees, pre-judgment, or post-judgment interest.

### B. Good Faith and Fair Dealing

Plaintiff has also claimed that, under Texas law, Defendant breached its duty of good faith and fair dealing arising from a contractual relationship between the insured and the insurer. Doc. 38 at 1-2. Specifically, Plaintiff alleges Defendant breached this duty by denying payment when liability was clear, by failing to provide Plaintiff with all its potential bases for coverage denial within a reasonable time after the claim was filed, and by "attempt[ing] to condition" payments for a separate policy on Plaintiff's full and final release of all claims. Doc. 42 at 9.

A duty of good faith and fair dealing arises as a result of "unequal bargaining power and the nature of the insurance contracts which would allow unscrupulous insurers to take advantage of their insured's misfortunes in bargaining for settlement or resolution of the claims." *Arnold v.*

*National County Mutual Fire Ins. Co.*, 725 S.W.2d 165, 167 (Tex. 1987). *See Aranda v. Insurance Co. of North America,* 748 S.W.2d 210, 212 (Tex. 1988). An insurer breaches the duty of good faith and fair dealing if it fails to pay promptly an insured's claim when liability becomes "reasonably clear." *Id*. Specifically, a claimant asserting a breach of this duty must establish (1) "the absence of a reasonable basis for denying or delaying payment of the benefits of the policy" and (2) "that the carrier knew or should have known that there was not a reasonable basis for denying the claim or delaying payment of the claim." *Id*. The first prong of the test demands an objective determination of whether a reasonable insurer, under the same or similar circumstance, would have denied or delayed payment. *Id.* A claimant will satisfy the second prong by "establishing that the carrier actually knew there was no reasonable basis to deny the claim or delay payment, or establishing that the carrier, based on its duty to investigate, should have known that there was no reasonable basis for denial or delay." *Id.*

Plaintiff contends that, after the Fifth Circuit confirmed that Wapiti's wreck removal was compulsory by law, liability became clear. However, instead of providing coverage under the P&I policy, Plaintiff alleges that Defendant has begun to invent new, different bases for coverage denial that were not raised in a reasonable time after the claim was filed—thereby violating sections 541.060(a)(3) and 541.060(a)(4)(B) of the Texas Insurance Code. *See* Tex. Ins. Code § 541.060(a)(3) ( a violation occurs if an insurer fails to "promptly provide to a policyholder a reasonable explanation of the basis in the policy . . . for the insurer's denial of a claim"); Tex. Ins. Code § 541.060(a)(4)(B) (a violation occurs if the insurer fails to "submit a reservation of rights to a policyholder"). Among these bases include Defendant's contentions that the barge was

not truly a wreck, that the hurricane plan warranty was potentially not complied with, and that potential overinsurance on the barge affects the amount in damages that Wapiti is due.[3]

While Defendant puts forward several bases to justify the non-payment of the full damages that Plaintiff asks for, it needs only one to meet its duty of good faith and fair dealing. *Aranda v. Ins. Co. of N. Am.,* 748 S.W.2d at 213. Indeed, "a bona fide controversy is sufficient reason for failure of an insurer to make a prompt payment of a loss claim." *Higginbotham v. State Farm Mut. Auto. Ins. Co.*, 103 F.3d 456, 460 (5th Cir. 1997). "As long as the insurer has a reasonable basis to deny or delay payment of a claim, even if that basis is eventually determined by the fact finder to be erroneous, the insurer is not liable for the tort of bad faith." *Id.* (citing *Lyons v. Millers Cas. Ins. Co.,* 866 S.W.2d 597, 600 (Tex. 1993)).

Here, Defendant has met its burden. While this Court has ultimately found that the barge at issue is considered a "wreck," it remains true that there was a bona fide controversy over what the term "wreck" might mean in this context and if the barge at issue met the requirements of such a definition. Indeed, while Plaintiff is correct that the Fifth Circuit found that the removal of the barge was "compulsory by law," it declined to decide if the barge was a wreck—as has this Court in the past. *See Wapiti Energy, LLC v. Clear Spring Prop. & Cas. Co.*, No. 4:22-CV-01192, 2023 U.S. Dist. LEXIS 32717 (S.D. Tex. Feb. 28, 2023).

Plaintiff contends that Defendant did not "communicate to Wapiti within a timely fashion" that it sought to deny coverage under the wreck removal clause. However, while it is true that Defendant's January 5th, 2022 declination of coverage letter addressed only Plaintiff's claim under the insurance package's Sue and Labor Clause (which allowed recovery of expenses reasonably

---

[3] Plaintiff takes special issue with the fact that Defendant's arguments regarding the hurricane plan and possible overinsurance of the barge have only been raised recently—three years after the claim was made. Doc. 42 at 7.

incurred in salving the vessel), Plaintiff does not dispute that Defendant had previously "den[ied] Wapiti's claims for damages under . . . the P&I Policy's Wreck Removal clause." Doc. 38 at 3. In short, Defendant did notify Plaintiff—albeit not in the official declination of coverage letter—that it disputed the wreck removal clause's applicability to Wapiti's claim. Additionally, throughout the life of this lawsuit, Defendant has consistently disputed both the "compulsory by law" language of the wreck removal provision and whether the term "wreck" is applicable in the instant case. *See* Doc. 15 at 13. The Court finds that Defendant did communicate to Plaintiff in a timely fashion that it sought to deny coverage under the wreck removal clause. As such, the Court finds and holds that Defendant has provided evidence of a "bona fide controversy" that justifies its non-payment of the claim and further finds and holds that it cannot grant summary judgment on this ground. *See Higginbotham*, 103 F.3d at 460.

As to Plaintiff's argument that Defendant's "multiple attempts at obtaining full releases from partial payments" results in a breach of good faith and fair dealing, the Court finds that there is insufficient evidence to rule on this issue. While it is true that "[an] insurance company cannot force an insured to settle for less than he was legally entitled to receive by conditioning prompt payment on a release of the insurer's liability for further payment," there continues to be a material dispute of fact on whether Defendant ever intentionally attempted to do so. *DeLaGarza v. State Farm Mut. Auto. Ins. Co.*, 181 S.W.3d 755, 756 (Tex. App. 2005).

In particular, Plaintiff points to two instances in which it believes that Defendant was attempting to force Wapiti to settle by conditioning payments on a release of liability. The first occurred in relation to Defendant's $265,000 payment for claims under the hull policy which Plaintiff alleges "Defendant attempted to condition . . . on Wapiti's full and final release of all claims, including the P&I claims." Doc. 42 at 9. The second occurred more recently after Wapiti

filed the instant Motions for Summary Judgment and Defendant offered a partial payment to Wapiti in the amount of $841,840.32 in exchange for a release of all claims. *Id*. After Plaintiff declined the offer, Defendant sent the check anyways and labeled it as a "SETTLEMENT." *Id*.

However, Defendant's counsel has since suggested that the sending of the "settlement" check was due to a miscommunication between Defendant and its counsel. *See* Motion Hearing dated 12/09/2024. Moreover, Defendant has maintained that the payment under the hull policy was accompanied with a "receipt and release of all other claims" primarily because of Clear Spring's understanding that the sending of that form was "customary in cases of this sort" and was not a bad faith effort to force Plaintiff to settle. Doc. 18 at 12. Indeed, Defendant points out that, soon after, once counsel was retained, the Hull claim was resolved without further issue. *Id*. Looking at these facts in the light most favorable to Defendant, there remains a material dispute of fact on whether Defendant's actions were intentionally coercive, or simple miscommunications.

It is not clear that Defendant's denial of payment on the wreck removal clause was either untimely or not a bona fide controversy. Neither is it clear that Defendant truly attempted to coerce Wapiti into a settlement during this lawsuit. The Court finds that summary judgment on whether Defendant breached its duty of good faith and fair dealing is premature.

### III. CONCLUSION

Plaintiff's Motion for Summary Judgment on the issue of damages is **GRANTED** in part and **DENIED** in part.

Plaintiff's Motion for Summary Judgment on the issue of good faith and fair dealing is **DENIED**.

**IT IS SO ORDERED**.

Signed at Houston, Texas on January 8th, 2024

_____
Keith P. Ellison
United States District Judge